Marc S. Dreier (MD-9713)
Robert J. Grand (RG-7412)
DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 328-6100
*Attorneys for Plaintiff*
*Geneva Capital Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
GENEVA CAPITAL CORP.                           :
                                               :
                      Plaintiff,        :  No. 06 Civ. _____
                                               :
            -against-                       :
                                               :  **COMPLAINT**
WAHOO ETHANOL, L.L.C., SUTTON                  :
ETHANOL, L.L.C., AMERICAN                      :
ETHANOL, L.L.C. and RAM AJJARAPU,              :
                                               :  **JURY TRIAL DEMANDED**
                      Defendants.       :
------------------------------------------------------------ x

JUDGE CASTEL

Geneva Capital Corp. ("Geneva"), by and through its undersigned counsel, as and for its Complaint against defendants Wahoo Ethanol, L.L.C. ("Wahoo Delaware"), Sutton Ethanol, L.L.C. ("Sutton"), American Ethanol, Inc. ("American") and Ram Ajjarapu ("Ajjarapu"), alleges as follows:

### RELEVANT BACKGROUND

1.    This is an action for breach of contract, tortious interference with contract and unjust enrichment arising from defendants' willful and calculated efforts to avoid their contractual obligations to Geneva and enrich themselves at Geneva's expense.

2.    Pursuant to two consulting agreements, one dated June 13, 2005 (the "Wahoo Agreement") and the other dated October 21, 2005 (the "Sutton Agreement"),

{00158806.DOC;3}

defendants Wahoo and Sutton and/or their predecessors in interest agreed to pay certain fees and other compensation to Geneva in consideration for Geneva's efforts to solicit potential investors in the development of ethanol production facilities located in Nebraska.

3.  As alleged in greater detail below, Geneva dutifully performed its obligations under the agreements and defendants did indeed secure financing through Geneva's efforts for at least two ethanol facilities. Defendants, however, have failed and refused to compensate Geneva in accordance with the terms of the agreements.

## THE PARTIES

4.  Geneva is a New York corporation with its principal place of business located at 445 Park Avenue, New York, New York. Geneva is engaged in the business, *inter alia*, of raising capital for its clients.

5.  Upon information and belief, Wahoo Delaware is a Delaware limited liability company with its principal place of business located in Wahoo, Nebraska. Upon further information and belief, Wahoo Delaware is the successor in interest to an entity with the same name originally formed and incorporated in Nebraska ("Wahoo Nebraska"), which was dissolved on or about November 30, 2005.

6.  Upon information and belief, Sutton is a Nebraska limited liability company with its principal place of business located in Sutton, Nebraska.

7.  Upon information and belief, American is a Delaware corporation with its principal place of business located in Chicago, Illinois. Upon information and belief, Wahoo Delaware and Sutton are subsidiaries of and/or affiliated with American.

8.  Upon information and belief, Ajjarapu is an individual residing in Tampa, Florida, and is the President of Wahoo Delaware, Sutton and American.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the parties and the matter in controversy exceeds the sum of $75,000.

10. Venue is proper pursuant to 28 U.S.C. § 1391(a).

## THE FACTS

**A.     The Wahoo Agreement**

11. In or about June 2005, Ajjarapu contacted David Khalilzad ("Khalilzad"), Geneva's Chairman and CEO, and solicited Geneva's assistance in securing financing for Wahoo Nebraska's construction of an ethanol production facility to be located in Wahoo, Nebraska. Thereafter, Ajjarapu and Khalilzad commenced negotiations concerning the terms pursuant to which Geneva would act as a consultant to Wahoo Nebraska for purposes of securing financing for the construction of the Wahoo plant.

12. During their negotiations Khalilzad informed Ajjarapu that, in addition to receiving compensation in the event that Wahoo Nebraska received financing for its plant through Geneva's efforts, Geneva required a $25,000 monthly retainer fee for its consulting services, irrespective of whether Wahoo Nebraska ultimately was able to procure financing through Geneva (the "Retainer").

13. Ajjarapu informed Khalilzad that Wahoo Nebraska had no objection to the Retainer but did not have the money to pay the Retainer at that time. Ajjarapu assured Khalilzad that Wahoo Nebraska would either come up with the money within 30 days, or, if it could not do so, it would issue a warrant to Geneva for the purchase of Wahoo Nebraska common stock in an amount satisfactory to Geneva.

14. On or about June 13, 2005, Geneva and Wahoo Nebraska executed and entered into the Wahoo Agreement. A copy of the Wahoo Agreement is annexed hereto as Exhibit A.

15. Pursuant to the Wahoo Agreement, Wahoo Nebraska agreed to retain Geneva as its "exclusive consultant" for a 90 day period (from June 13, 2005 through September 11, 2005) "to provide [Wahoo Nebraska] certain financial and investment banking advisory services with respect to obtaining up to $40 million in equity financing" for the construction of the Wahoo Nebraska ethanol production facility.

16. During the 90 day exclusive period, Wahoo Nebraska was prohibited from communicating with placement agents other than Geneva and from communicating with potential investors other than the potential investors introduced to Wahoo Nebraska by Geneva.

17. Paragraph 1(A) of the Wahoo Agreement provided that Geneva "would undertake to develop a list of potential sources for the required financing" and present the sources to Ajjarapu (as Wahoo Nebraska's representative) for approval. Upon Ajjarapu's written acknowledgment and approval, the list would then be incorporated into the Agreement as "Exhibit A," and Geneva would thereafter arrange meetings, telephone calls or other communications with those parties.

18. Pursuant to paragraph 3(a) of the Wahoo Agreement, Wahoo Nebraska agreed to pay Geneva "a success fee equal to 10% in cash for the amount raised" through Geneva's efforts (the "Wahoo Fee"). The Agreement provided, by way of illustration, that if [Wahoo Nebraska] receives $40 million from Geneva's investors, Geneva would receive a fee of $4 million as placement fee.

19. Pursuant to paragraph 3(b) of the Wahoo Agreement, Wahoo Nebraska agreed that Geneva would be entitled to receive the full Wahoo Fee "if any transaction with a client of Wahoo Nebraska introduced by Geneva is consummated and funded during the [90-day exclusive] terms of this agreement and for a period of five years from its expiration."

20. Pursuant to paragraph 3(c) of the Wahoo Agreement, Wahoo Nebraska further agreed that Geneva would be entitled to the full Wahoo Fee "if [Wahoo Nebraska] raises capital elsewhere during Geneva's engagement of 90 days."

21. Pursuant to paragraph 3(g) of the Wahoo Agreement, Wahoo Nebraska further agreed to direct any financing source to pay Geneva the Wahoo Fee directly at closing.

B. **Geneva's Performance Under the Wahoo Agreement**

22. Almost immediately after execution of the Wahoo Agreement, Geneva began reaching out to potential investors for the Wahoo Nebraska plant.

23. In accordance with paragraph 1(A) of the Wahoo Agreement, on or about July 15, 2005, Geneva sent to Wahoo Nebraska a list of potential investors (the "July 15 Wahoo List"). The July Wahoo 15 List, titled "Exhibit A," explicitly states that "[n]o individual or entity is authorized to speak with the list below except Geneva since Geneva has been engaged as an exclusive placement agent for [Wahoo Nebraska]." A copy of the July 15 Wahoo List is annexed hereto as Exhibit B.

24. The July 15 Wahoo List expressly provides that "[a]ny investment by any entity on this list either directly or indirectly guarantees Geneva's fee."

25. Ajjarapu signed and dated the July 15 Wahoo List on behalf of Wahoo Nebraska and returned it to Geneva.

26. On or about July 29, 2005, Geneva sent to Wahoo Nebraska an updated list of potential investors (the "July 29 Wahoo List"). As with the July 15 Wahoo List, the July 29 Wahoo List also explicitly states that "[n]o individual or entity is authorized to speak with the list below except Geneva since Geneva has been engaged as an exclusive placement agent for [Wahoo Nebraska]..." A copy of the July 29 Wahoo List is annexed hereto as Exhibit C.

27. Again, as with the July 15 Wahoo List, the July 29 Wahoo List expressly provides that "[a]ny investment by any entity on this list either directly or indirectly guarantees Geneva's fee."

28. Ajjarapu signed and dated the July 29 Wahoo List on behalf of Wahoo Nebraska and returned it to Geneva.

29. In or about July or August 2005, Wahoo Nebraska prepared a business plan for distribution to potential investors. The cover page of the business plan contains Wahoo Nebraska's business address, telephone and facsimile numbers, and its website address. Just below Wahoo Nebraska's website address, the cover page provides: "For further information, please contact our Exclusive Placement Firm". It then provides the contact information for Khalilzad and Geneva. A copy of this Business Plan is annexed hereto as Exhibit D.

30. Throughout the summer of 2005, Geneva solicited potential investors for Wahoo Nebraska. Khalilzad and Ajjarapu spoke frequently -- often more than once a day -- about the ethanol production facility and other ethanol related projects then under consideration by Ajjarapu.

31. On or about September 19, 2005, Geneva sent to Wahoo Nebraska another updated list of potential investors (the "September 19 Wahoo List"). As with the July 15 Wahoo List and the July 29 Wahoo List, the September 19 Wahoo List explicitly stated that "[n]o

individual or entity is authorized to speak with the list below except Geneva since Geneva has been engaged as an exclusive placement agent for [Wahoo Nebraska]..." A copy of the September 19 Wahoo List is annexed hereto as Exhibit E.

32. Once again, as with the July 15 Wahoo List and the July 29 Wahoo List, the September 19 Wahoo List expressly provides that "[a]ny investment by any entity on this list either directly or indirectly guarantees Geneva's fee."

33. Ajjarapu signed and dated the September 19 Wahoo List on behalf of Wahoo Nebraska and returned it to Geneva.

C. **The Warrant Agreement**

34. In or about early July 2005, Ajjarapu informed Khalilzad that Wahoo Nebraska was unable to come up with sufficient funds to pay the Retainer. Thereafter, in consideration for waiving its monthly retainer, which was a critical and material component of the Wahoo Agreement, Geneva agreed to accept a warrant to purchase 500,000 shares of Wahoo Nebraska common stock at a price of $1.00 per share at any time prior to 2015 (the "Warrant").

35. Geneva requested that the Warrant be issued to William and Elizabeth Everett, and Wahoo Nebraska agreed to issue, and did issue, the Warrant to the Everetts.

36. On or about July 11, 2005, Geneva and Wahoo Nebraska executed an agreement reflecting the issuance of the Warrant (the "Warrant Agreement"). A copy of the Warrant Agreement is annexed hereto as Exhibit F.

37. The Warrant Agreement expressly provides that the Warrant was issued in consideration for Geneva's waiver of its $25,000 monthly retainer and confirms that the Warrant was issued to the Everetts.

38.     The Warrant Agreement further provides that the Warrant cannot be cancelled under any circumstances.

### D.     Defendants' Secret Formation of Wahoo Delaware

39.     On September 30, 2005, unbeknownst to Geneva, Ajjarapu caused Wahoo Delaware to be incorporated in Delaware under the same name as Wahoo Nebraska.

40.     Notwithstanding his almost daily communications with Geneva, Ajjarapu never disclosed to Geneva that Wahoo Delaware had been formed and never discussed with Geneva the purpose behind its formation.

41.     As Geneva would later learn, the formation of Wahoo Delaware was one of many steps undertaken by Ajjarapu in furtherance of his deceitful efforts to avoid Wahoo Nebraska's contractual obligations to Geneva and avoid paying Geneva the compensation it was rightfully owed.

### E.     The Universal Agreement

42.     During the summer of 2005, Ajjarapu represented to Khalilzad that he wanted Khalilzad and Geneva to be more integrally involved in Ajjarapu's various business interests apart from the Wahoo plant. In furtherance thereof, in or about August 2005, Ajjarapu and Khalilzad formed a company called Universal Energy, L.L.C. ("Universal Energy").

43.     On or about August 9, 2005, Geneva was retained by Universal Energy as its exclusive consultant to provide certain financial and investment banking advisory services in connection with raising up to $300 million for Universal Energy (the "Universal Agreement"). A copy of the Universal Agreement is annexed hereto as Exhibit G.

44.     Pursuant to the Universal Agreement, in consideration for its services, Geneva was to be paid a success fee equal to 2% of all capital raised through Geneva's efforts.

In addition, the Universal Agreement provides that Geneva was to own 49% of the "Founder Shares" of Universal Energy. The Universal Agreement further provides that Khalilzad was to be the Chairman of Universal Energy, and Ajjarapu, who executed the Universal Agreement on behalf of Universal Energy, was to be a Director, President and Treasurer.

F. **The Sutton Agreement**

45. In the fall of 2005, Khalilzad and Ajjarapu formed another entity known as Sutton Ethanol, L.L.C. ("Sutton") for the purpose of the development, construction and operation of an ethanol plant to be located in Sutton, Nebraska. Thereafter, Ajjarapu and Khalilzad negotiated the terms pursuant to which Geneva would act as a consultant to Sutton for purposes of securing financing for the construction of the Sutton plant.

46. On or about October 21, 2005, Khalilzad, on behalf of Geneva, and Ajjarapu, on behalf of Sutton, entered into the Sutton Agreement. A copy of the Sutton Agreement is annexed hereto as Exhibit H.

47. Pursuant to the Sutton Agreement, Sutton agreed to retain Geneva as its "exclusive consultant" for a 90 day period (from October 21, 2005 through January 20, 2005) to perform certain financial and investment banking advisory services on Sutton's behalf in connection with obtaining up to $70 million in financing for the construction of the Sutton ethanol production facility.

48. The exclusive engagement of Geneva by Sutton prohibited Sutton from communicating with placement agents other than Geneva and from communicating with potential investors other than the potential investors introduced to Sutton by Geneva during the exclusive term of the Sutton Agreement.

49. Like the Wahoo Agreement, paragraph 1 of the Sutton Agreement provided that Geneva, as placement agent for Sutton, was to utilize its contacts to "develop a list of potential sources of the required financing" and present the sources to Ajjarapu (as Sutton's representative) for approval. Upon Ajjarapu's written acknowledgment and approval, the list would then be incorporated into the Agreement as "Exhibit A," and Geneva would thereafter arrange meetings, telephone calls or other communications with the interested parties.

50. Pursuant to paragraph 3(a) of the Sutton Agreement, in consideration for Geneva's services, Sutton agreed to pay Geneva a success fee equal to 6% of any amounts raised through Geneva's efforts (the "Sutton Fee"). Thus, for example, if Sutton received $70 million through those efforts, Geneva would receive $4.2 million.

51. Pursuant to paragraph 3(b) of the Sutton Agreement, Sutton agreed that if Sutton received funding from an investor introduced through Geneva's efforts either during the term of the exclusive period or within five years thereafter, Geneva would be entitled to receive the full Sutton Fee.

52. Paragraph 3(c) further provides that if, during the period of Geneva's exclusive engagement, Sutton raised capital from sources other than those introduced to Sutton by Geneva, and Geneva still would be entitled to the full Sutton Fee.

53. Pursuant to paragraph 3(i) of the Sutton Agreement, Sutton was required to direct the financing source to pay Geneva its Fee directly at closing.

54. Pursuant to paragraph 3(d), the Sutton Agreement further provides that Khalilzad is to receive 45% of the "Founder Shares" and is entitled to receive "45% of all the profit and dividend payout or any cash distribution on [an] annual basis after receipt of the $70 million" by Sutton.

55. Pursuant to paragraph 3(d) of the Sutton Agreement, Khalilzad was to become Chairman of Sutton and was to serve on to the Board of Directors. Paragraph 3(i) of the Sutton Agreement provided that all of the decisions regarding Sutton were to be made jointly by Khalilzad and Ajjarapu.

G. **Geneva's Performance Under the Sutton Agreement**

56. Upon execution of the Sutton Agreement, Geneva began reaching out to potential investors for the Sutton facility, while continuing its solicitation of potential investors for Wahoo Nebraska.

57. On October 28, 2005, Geneva sent to Sutton a list of potential investors for Sutton (the "Sutton List"). A copy of the Sutton List is annexed hereto as Exhibit I.

H. **Defendants' Willful Breach of the Wahoo Agreement and the Sutton Agreement**

58. The ninth and last entry on the July 29 Wahoo List is an entity referred to as "Pacific Ethanol." Prior to July 29, 2005, Pacific Ethanol had expressed interest to Khalilzad in investing in the Wahoo production facility.

59. The September 19 Wahoo List also listed Pacific Ethanol as a potential investor in Wahoo Nebraska that had been solicited by Geneva.

60. Upon information and belief, based on Geneva's identification of Pacific Ethanol as a potential investor, Ajjarapu contacted Pacific Ethanol in the early Fall of 2005.

61. On or about October 31, 2005, Ajjarapu acknowledged to Khalilzad via email that Pacific Ethanol had "been reviewing our business plan for the last one month for a possible investment."

62. Upon information and belief, sometime in the Fall of 2005, Pacific Ethanol introduced Ajjarapu to an individual named Eric McAfee ("McAfee").

63. McAfee was one of the founders of Pacific Ethanol. He had since formed Cagan-McAfee Capital Partners, LLC ("CMCP") but had maintained an active and long-standing business relationship with Pacific Ethanol. Upon information and belief, until November 2005, CMCP was party to an agreement with Pacific Ethanol, pursuant to which CMCP provided investment banking and other advisory services to Pacific Ethanol in connection with raising funding for an ethanol production facility. Upon information and belief, CMCP, for the past several years, has received advisory fees and other compensation from Pacific Ethanol on a regular basis pursuant to their agreement.

64. Upon information and belief, without Geneva's knowledge or authorization, Ajjarapu, on behalf of, *inter alia*, Wahoo Nebraska, and subsequently on behalf of Wahoo Delaware, as well as on behalf of Sutton, engaged in discussions with Pacific Ethanol and McAfee throughout the Fall 2005 and Winter 2005/2006, about the prospect of funding for the Wahoo plant and the Sutton plant.

65. Unbeknownst to Geneva, on or about November 30, 2005, Ajjarapu caused Wahoo Nebraska to be dissolved. Despite their daily communication during this time, Ajjarapu never disclosed to Khalilzad that Wahoo Nebraska was dissolved and never discussed with Khalilzad the purpose of the dissolution.

66. As Geneva would later learn, the dissolution of Wahoo Nebraska was undertaken by Ajjarapu in furtherance of his efforts to utilize Geneva's contacts to raise capital for the ethanol production facilities but avoid paying Geneva the compensation due and owing under the Wahoo Agreement and Sutton Agreement.

67. On January 24, 2006, Ajjarapu informed Khalilzad via email that Ajjarapu had received all necessary funding (not less than $110 million) for both Wahoo and Sutton and that he was no longer looking for money for either of those projects.

68. Clearly, Ajjarapu had been secretly negotiating with investors for Wahoo and Sutton behind Khalilzad's back and in violation of the Sutton Agreement.

69. Upon hearing this information, Khalilzad asked Ajjarapu to identify the "Wahoo/Sutton" investors, but Ajjarapu would not disclose their identity to Khalilzad.

70. Shortly thereafter, on or about January 30, 2006, counsel for Sutton, Wahoo and Ajjarapu sent a letter to Geneva which purported to serve as a Notice of Termination of the Sutton Agreement (the "Sutton Termination Letter"). The Sutton Termination Letter states that the Sutton Agreement expired on January 20, 2006 and that Sutton no longer was in need of Geneva's services.

71. Also on January 30, 2006, counsel for Wahoo and Ajjarapu sent a Notice of Termination letter to William and Elizabeth Everett, which purported to terminate the Warrant Agreement (the "Warrant Termination Letter"). The Warrant Termination Letter states that, because Wahoo (Nebraska) was dissolved and ceased business operations on November 30, 2005, the right to purchase shares of Wahoo common stock is null and void.

72. Despite repeated requests by Khalilzad, Ajjarapu has refused to disclose to Khalilzad the source(s) of the capital for Wahoo or Sutton. Similarly, Ajjarapu has refused to disclose to Khalilzad the chronology of the financial transaction(s) relative to the funding of Wahoo and Sutton.

73. Upon information and belief, McAfee (and/or and entity or entities affiliated with McAfee) is the source of the funding for both Wahoo and Sutton.

74. Ajjarapu would never have met McAfee except through Geneva's diligent efforts under the Wahoo and Sutton Agreements. Upon information and belief, Ajjarapu and McAfee formed American in or about February 2006, for the purpose of developing, owning and operating multiple ethanol production facilities in the Midwest, including facilities at Wahoo and Sutton.

75. According to American's website, American currently owns two sites in Nebraska that are permitted for 100 million gallons of total ethanol production -- the very same facilities that are the subject of the Wahoo and Sutton Agreements.

## COUNT I
### (Breach of Contract as against Wahoo Delaware)

76. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 75 hereof as if fully set forth herein.

77. Geneva has fully performed all of its obligations under the Wahoo Agreement.

78. Pacific Ethanol has directly or indirectly provided financing for Wahoo through its co-founder, McAfee.

79. Wahoo has materially and substantially breached the Wahoo Agreement by, *inter alia*, unlawfully failing and refusing to pay Geneva the Wahoo Fee and other compensation due and owing as set forth in the Wahoo Agreement.

80. As a direct result of the foregoing, Geneva has suffered damages in an amount not less than $4,000,000 to be determined at trial.

## COUNT II
### (Breach of Contract as against Sutton)

81. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 75 hereof as if fully set forth herein.

82. Geneva has fully performed all of its obligations under the Sutton Agreement.

83. Sutton has materially and substantially breached the Sutton Agreement by, *inter alia*, (i) negotiating with potential investors other than those included on the Sutton List during the term of the Sutton Agreement in violation of its exclusive engagement with Geneva, and (ii) failing to pay Geneva its success fee and other compensation due and owing Geneva in an amount not less than $4.2 million.

84. As a direct result of the foregoing, Geneva has suffered damages in an amount not less than $4.2 million to be determined at trial.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing as against Wahoo and Sutton)

85. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 75 hereof as if fully set forth herein.

86. Wahoo and Sutton have materially and substantially breached the covenant of good faith and fair dealing contained in the Wahoo and Sutton Agreements by, *inter alia*, unlawfully (i) failing to pay Geneva its $4 million in accordance with the terms of the Wahoo Agreement, (ii) negotiating with potential investors not contained on the Wahoo Lists or the Sutton List, and (iii) failing to pay Geneva $4.2 million in accordance with the terms of the Sutton Agreement, for a total of not less than $8.2 million.

87. As a direct result of the foregoing, Geneva has suffered damages in an amount not less than $8.2 million to be determined at trial.

## COUNT IV
### (Unjust Enrichment as against Ajjarapu and American)

88. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 75 hereof as if fully set forth herein.

89. Geneva provided valuable services to Ajjarapu and American at their request.

90. Ajjarapu and American were the direct beneficiaries of the services provided by Geneva and were unjustly enriched to Geneva's detriment by reason of their failure to pay Geneva for such services.

91. As a direct result of the foregoing, Geneva has suffered damages in an amount not less than $10 million, to be determined at trial.

## COUNT V
### (Tortious Interference With Contract as against Ajjarapu and American)

92. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 75 hereof as if fully set forth herein.

93. Ajjarapu and American knew that Geneva had entered into a contract with Wahoo Nebraska, to which Wahoo Delaware succeeded, whereby, *inter alia*, (i) Wahoo Nebraska agreed to compensate Geneva in the event that Wahoo Nebraska was able to procure financing through Geneva's efforts, and (ii) Wahoo Nebraska agreed to issue the Warrant to the Everetts in exchange for Geneva's waiver of its usual and customary $25,000 monthly retainer fee.

94. Ajjarapu and American knew that Geneva had entered into a contract with Sutton whereby, *inter alia*, Sutton agreed (i) to retain Geneva as its exclusive placement agent, thereby prohibiting Sutton from communicating with placement agents other than Geneva and from communicating with potential investors other than those potential investors introduced to Sutton by Geneva, and (ii) to compensate Geneva in the event that Sutton procured financing during the term of the engagement.

95. Ajjarapu and American willfully and tortiously interfered, without justification, with Geneva's contractual relations with Wahoo and Sutton by, among other things, knowingly and improperly inducing Wahoo and Sutton to breach their contracts with Geneva.

96. By reason of the foregoing, Geneva has suffered damages in an amount in not less than $8.2 million, to be determined at trial.

### COUNT VI
### (Declaratory Judgment/Specific Performance as against Wahoo)

97. Geneva repeats and realleges each of the allegations contained in paragraphs 1 through 119 hereof as if fully set forth herein.

98. Geneva has fully performed all of its obligations under the Wahoo Agreement.

99. Wahoo has breached the Wahoo Agreement by unlawfully terminating the Warrant to purchase 500,000 shares of Wahoo common stock in violation of its terms.

100. There is a present controversy between Geneva and Wahoo as to the right to the Warrant pursuant to the Wahoo Agreement.

101. Geneva has no adequate remedy at law.

102. By reason of the foregoing, Geneva is entitled to a declaratory judgment that Geneva is entitled to have the Warrant re-instated and or re-issued.

## **DEMAND FOR JURY TRIAL**

103. Geneva demands a trial by jury as to all issues so triable.

WHEREFORE, Geneva demands judgment as follows:

A. On Count One, awarding Geneva damages against Wahoo in an amount not less than $4 million to be determined at trial.

B. On Count Two, awarding Geneva damages against Sutton in an amount not less than $4.2 million to be determined at trial.

C. On Count Three, awarding Geneva damages (i) against Wahoo in an amount not less than $4 million to be determined at trial, and (ii) against Sutton in an amount not less than $4.2 million to be determined at trial.

D. On Count Four awarding Geneva damages against Ajjarapu and American, jointly and severally, in an amount not less than $10 million to be determined at trial.

E. On Count Five awarding Geneva damages against Ajjarapu and American, jointly and severally, in an amount not less than $8.2 million to be determined at trial.

F. On Count Six, declaring that Geneva is entitled to have the Warrant re-instated and/or re-issued.

   G.  Awarding Geneva its costs, prejudgment interest and such other and additional relief as the Court deems just and proper.

Dated: New York, New York
   May 31, 2006

             DREIER LLP

             _____
             Marc S. Dreier (MD-9713)
             Robert J. Grand (RG-7412)
             499 Park Avenue
             New York, New York 10022
             212-328-6100

             *Attorneys for Plaintiff*
             *Geneva Capital Corp. LLC*